RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0045p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

STEVE B. SMITH, DAVID KUCERA, VICKIE F. FORGETY,

　　　　　　　　*Plaintiffs-Appellants,*

　　　　*v.*

JEFFERSON COUNTY BOARD OF SCHOOL COMMISSIONERS; DOUGLAS R. MOODY, LANA LECKIE, BILL POWELL, DAVID LOCKHART, ANNE M. POTTS, GREG SHARPE, LOUISE SNODDERLY, individually and in their official capacity as members of the Jefferson County Board of Education; KINGSWOOD SCHOOL INC.,

　　　　　　　　*Defendants-Appellees.*

No. 06-6533

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 03-00593—Thomas W. Phillips, District Judge.

Argued: December 2, 2009

Decided and Filed: February 11, 2011

Before: BATCHELDER, Chief Judge; MARTIN, BOGGS, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** George F. Legg, STONE & HINDS, P.C., Knoxville, Tennessee, for Appellants. Jonathan Swann Taylor, BECKER, FLEISHMAN & KNIGHT, Knoxville, Tennessee, for Appellees. **ON BRIEF:** George F. Legg, Eric J. Morrison, STONE & HINDS, P.C., Knoxville, Tennessee, for Appellants. Arthur F. Knight III, BECKER, FLEISHMAN & KNIGHT, Knoxville, Tennessee, for Appellees.

　　　　MOORE, J., delivered the opinion of the court, in which MARTIN, BOGGS, COLE, CLAY, GILMAN, GIBBONS, SUTTON, McKEAGUE, GRIFFIN, and WHITE, JJ., joined. MARTIN, J. (pp. 29–31), joined by Judge MOORE, and SUTTON, J. (pp. 32–35), delivered separate opinions concurring in full in the majority opinion.

1

BATCHELDER, C.J. (pp. 36–40), delivered a separate opinion concurring in part and dissenting in part.  ROGERS, J. (pp. 41–46), delivered a separate dissenting opinion, in which COOK and KETHLEDGE, JJ., joined and in which BATCHELDER, C.J., joined in part.

————————————

**OPINION**

————————————

KAREN NELSON MOORE, Circuit Judge.  The former principal of Jefferson County, Tennessee's alternative school and two former teachers at the school (collectively, "the teachers") allege that, by closing the county's public alternative school and contracting with Kingswood Academy ("Kingswood") to provide alternative-school services for public-school students, the Jefferson County Board of School Commissioners and its members (collectively, "the Board" or "the defendants") violated the teachers' (1) First Amendment Establishment Clause rights under the U.S. Constitution and similar rights under article I, section 3 of the Tennessee Constitution; and (2) procedural and substantive due-process rights under the Fourteenth Amendment to the U.S. Constitution and article I, section 8 of the Tennessee Constitution.  The teachers appeal the grant of summary judgment to the Board on all of the teachers' claims and the denial of the teachers' motion for partial summary judgment.

We hold that the teachers have standing to raise the Establishment Clause claim. In addition, we hold that the Board did not violate the teachers' procedural and substantive due-process rights and that the individual Board members are entitled to legislative immunity.  Therefore, we **REVERSE** the district court's grant of summary judgment to the Board on the teachers' Establishment Clause claims and the district court's determination that legislative immunity for the Board members was moot, and **REMAND** to the district court for further proceedings.  We **AFFIRM** the district court's grant of summary judgment to the Board on the teachers' procedural and substantive due-process claims.  Finally, because we hold that the individual Board members are

entitled to legislative immunity, we need not address whether they are entitled to qualified immunity.

## I.  BACKGROUND

### A.  Factual Background

The Board employed all of the teachers in this case during the 2002–2003 school year.  Vickie F. Forgety and Steve B. Smith were tenured teachers.  Forgety served as the principal of the alternative school.  David Kucera taught under a contract that entitled him to continue in his position for another year unless he was notified by April 15, 2003 of the nonrenewal of his contract.

#### 1.  Budget Cuts

After discussion of the budget on June 26, 2003, the Board voted to eliminate several programs, including the alternative school and the positions of the teachers and principal working there.  It voted again to "officially delete" the alternative school at its July 10, 2003 meeting.  Joint Appendix ("J.A.") at 351 (7/10/03 Mins. of the Regular Meeting).  In addition, the Board voted at the July meeting to contract with Kingswood to provide alternative-school services for public-school students for the 2003–2004 academic year.  *Id.* at 352.  The contract between the Board and Kingswood specifically stated that Kingswood personnel would not be considered employees of the Board.  In fact, the Director of Schools for the county, Douglas Moody, was not authorized to hire or fire the Kingswood employees who provided the alternative-school services, nor did he supervise or evaluate those individuals.  Counsel for the Board, Chuck Cagle, approved the contract.

Moody submitted a "Request for Closing a School" to the Tennessee Department of Education on July 23, 2003, indicating that "[b]udget constraints for FY 2003–2004 led to a School Board decision to outsource Alternative school services on contract."  J.A. at 361.  He stated that he had only one reason for recommending the Kingswood contract to the Board:  "it was entirely a financial consideration that would fit in with

other budget cuts." J.A. at 159 (Moody Dep. at 46). Similarly, the Chair of the Board, Lana Leckie, stated in her deposition that "financial costs" constituted "the primary reason to enter into the contract" and that it would save them $171,423. J.A. at 378 (Leckie Dep. at 34).

Moody informed Forgety, Smith, and Kucera of the abolishment of their positions after the Board's decision. Each of the teachers eventually found a new position, though only one continued her employment with the Board. As tenured teachers, Forgety and Smith were placed on a "Preferred List for Re-employment of Tenured Teachers." J.A. at 243. Forgety declined to accept the positions that the Board initially offered to her because she considered them to be inferior in pay and rank to her previous position at the alternative school; she drew unemployment for the 2003–2004 school year. When the Board offered Forgety a principalship in the spring of 2004, she accepted. Smith, however, did not respond to the Board's offer of a History position in the fall of 2003; he had accepted a history position in Georgia in late July 2003. Kucera, a non-tenured teacher, drew unemployment pay for two months; by November 2003, he had not received any offers of employment from the Board in areas in which he was certified. Eventually, he took a job with Mountain View Youth Development Center as a case manager.

### 2. Kingswood

In a sworn statement, the "Administrator" of Kingswood, Darrell M. Helton, stated that the school is an accredited private school, providing "day treatment programs for children and adolescents who have behavioral and/or emotional problems." J.A. at 178 (Sworn Statement of Helton). Helton noted that the school is licensed by the Tennessee Department of Mental Health and Developmental Disabilities. Also, he noted that an April 2005 study of Tennessee's alternative schools by "the Tennessee Comptroller of the Treasury Office of Education Accountability . . . specifically identified as [sic] Kingswood School, Inc. [as] a private contract provider of alternative school services that local education agencies could explore to provide alternative

schooling to their students." *Id.*; J.A. 327 (Tennessee's Alternative Schools at 37). In addition, Helton stated that Kingswood had contracted with Jefferson, Grainger, Hancock, and Claiborne counties in Tennessee to provide alternative-school services.

Kingswood's promotional materials state that "[f]or over 60 years Kingswood School and Home for Children has helped children who have been abused, abandoned and neglected. Kingswood School is unique because we offer children a Christian environment of love and encouragement." J.A. at 454 (Happy Easter, 2006 letter from Kingswood). The school's 2005 Annual Report states that

> Kingswood was founded with the intent to insure that each child placed in its care receives Christian religious training. A unique feature of the Kingswood program is the emphasis that is placed upon instilling in each child a personal faith in God, and the assurance of the saving grace of Jesus Christ while remaining unaffiliated with any specific denomination or Church.

J.A. at 457 (Annual Report). The 2005 Annual Report also states that Kingswood's "ministry" can be supported in many ways. *Id.* at 456. Although the residential-care description states that there is an "emphasis" on "spiritual" growth, the day-treatment description does not include that statement. *Id.*

## B. Procedural Background

The district court consolidated cases brought by Forgety, Smith, and Kucera.[1] Together the teachers brought suit against the Jefferson County School Board of Commissioners and its members in their official and individual capacities[2] under 42 U.S.C. § 1983, the Establishment Clause, and the Fifth and Fourteenth Amendments to

---

[1]Forgety filed suit on June 24, 2004 against the same entities and individuals that Smith and Kucera had filed suit against on November 13, 2003. Forgety, Smith, and Kucera did not oppose the defendants' motion to consolidate the cases, and the district court ordered consolidation on January 18, 2005.

[2]The teachers sued the Director of Schools, Douglas R. Moody (who also served as Secretary to the Board) and the following Board members in both their official and individual capacities: Lana Leckie, Bill Powell, David Lockhart, Anne M. Potts, Greg Sharpe, and Louise Snodderly. The only Board member that the teachers did not sue, Emily Fox, voted against the program cuts that affected the alternative school.

the U.S. Constitution. Also, they brought suit under various provisions of the Tennessee Constitution and Code. The teachers sought declaratory relief and damages. Specifically, their third amended complaint requested

> 1. That this Court issue a judgment declaring that the acts of School Defendants in eliminating the Jefferson County Alternative School Program were illegal and *ultra vires* acts, and thus were void acts. Further, and accordingly, that this Court further declare that any procedural due process which attached to those void acts was likewise void. Further, that this Court directly evaluate the challenged procedures to ensure that they comport with due process, and that this Court declare that the procedures invoked by School Defendants did not so comport with due process.

> 2. That this Court issue a judgment declaring that the acts of School Defendants hereinbefore complained of violated the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, the Constitution of the State of Tennessee, and Tennessee Code Annotated §§ 49-2-203, 49-5-501 et seq., and 49-6-3402, and further denied Plaintiffs equal protection of the law. Further that this Court issue a judgment declaring that the acts of School Defendants hereinbefore complained of violated Plaintiffs' constitutional rights protecting them from the impairment of the obligations of their contracts. . . . That the Court also issue a judgment finding and declaring that the acts of the Defendants violated Plaintiffs' rights under The Establishment Clause of the First Amendment to the United States Constitution and under Article I, Section 3 of the Tennessee Constitution.

> 3. That this Court issue a judgment directing School Defendants to make Plaintiffs whole for all losses of wages, benefits, and all other terms and conditions of employment, and further directing and ordering said Defendants to pay compensatory damages to Plaintiffs for all damages Plaintiffs have suffered . . . in the amount of $1,000,000.00 for Plaintiff, Steve B. Smith, in the amount of $100,000.00 for Plaintiff, David Kucera, and in the amount of $1,000,000.00 for Plaintiff Vickie F. Forgety.

J.A. at 58 (Third Am. Compl. ¶ 40).

On August 9, 2006, the teachers moved for partial summary judgment "on the Federal Establishment Clause and Due Process claims and upon the pendent State

claims, on the issue of liability, and the legality of Defendants' actions." J.A. at 390. Less than two weeks later, the Board filed a cross-motion for summary judgment. The Tennessee Education Association filed an amicus curiae brief. On November 2, 2006, the district court denied the teachers' motion for partial summary judgment and granted the Board's motion for summary judgment, in part for lack of standing. The teachers filed a timely appeal.

## II. ANALYSIS

### A. Standards of Review

We review a district court's grant of summary judgment de novo. *Mazur v. Young*, 507 F.3d 1013, 1016 (6th Cir. 2007). "Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c)). "Although the denial of a motion for summary judgment is usually an interlocutory order that is not immediately appealable, where an appeal from a denial of summary judgment is presented in tandem with a grant of summary judgment, this court has jurisdiction to review the propriety of the district court's denial of summary judgment." *Tenn. ex rel. Wireless Income Props., LLC v. City of Chattanooga*, 403 F.3d 392, 395 (6th Cir. 2005) (internal quotation marks omitted). We review de novo denials of motions for summary judgment "'on purely legal grounds'"; we review for abuse of discretion denials "based on the finding of a genuine issue of material fact." *Id.* at 395–96 (quoting *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004)).

When the district court reaches conclusions of law regarding standing, we review the district court's decision de novo. *Doe v. Porter*, 370 F.3d 558, 561 (6th Cir. 2004). In addition, "the issue whether qualified immunity is applicable to an official's actions is a question of law." *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). Finally, if a district court does not rule on an issue that the parties raised in their

summary-judgment motions, we may rule on such issues under 28 U.S.C. § 2106 without remanding them, as long as the parties were given a full and fair opportunity to address those issues. *See Trustees of the Mich. Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 594-95 (6th Cir. 2000) (holding that a court of appeals may order entry of summary judgment when "the parties . . . had a chance to dispute facts material to the plaintiffs' claim"); *United States v. 5 S 351 Tuthill Road, Naperville, Ill.*, 233 F.3d 1017, 1024–25 (7th Cir. 2000) (reversing the district court's holding that a claimant did not have standing and determining that summary judgment was not appropriate for either party because key facts were not included in the record).

**B. Establishment Clause Claim**

As a threshold matter, we must determine whether the teachers have standing to bring their federal Establishment Clause claim. Although the parties' cross-motions for summary judgment raised the issue of whether the teachers had established both individual standing and municipal-taxpayer standing, the district court addressed only individual standing in its decision. The district court concluded that the teachers did not meet the individual-standing requirements because their alleged injuries were the direct result of the Board's decision to allow a third party to run the alternative school, not the result of that third party being a "faith based organization." J.A. at 69 (Dist. Ct. Op. at 9). On appeal, the teachers argue that they meet the requirements for both individual standing and municipal-taxpayer standing. We hold that none of the teachers have individual standing to bring suit, but Forgety and Kucera meet the municipal-taxpayer standing requirements.

**1. Standing as Individuals**

Standing to bring suit must be determined at the time the complaint is filed. *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004), *cert. denied*, 544 U.S. 949 (2005). A plaintiff must meet both constitutional and prudential requirements to establish individual standing. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To meet the minimum constitutional standards for individual standing under Article III,

> a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). The Supreme Court "repeatedly has rejected claims of standing predicated on the right, possessed by every citizen, to require that the Government be administered according to law." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 482–83 (1982) (internal quotation marks omitted).

A plaintiff must also meet the following prudential requirements for standing developed by the Supreme Court. First, a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 474 (internal quotation marks omitted). Second, a plaintiff must present a claim that is "more than a generalized grievance." *City of Cleveland v. Ohio*, 508 F.3d 827, 835 (6th Cir. 2007) (internal quotation marks omitted). Finally, the complaint must "fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge*, 454 U.S. at 475 (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)).

Here, the teachers clearly satisfy the constitutional requirements for standing, at least as to damages. They suffered the injury of losing their jobs; that injury was the direct result of the Board's decision to abolish the public alternative school and to contract with Kingswood;[3] and the injury can be redressed by an order that the Board

---

[3]In this context, "fairly traceable" merely means that something must link the plaintiffs' job losses to the contract with Kingswood. State law requires the Board to establish at least one alternative school for grades seven through twelve. *See* Tenn. Code Ann. § 49-6-3402(a). Once the Board eliminated the alternative school and terminated the teachers, it was required to fund a new alternative school.

Chief Judge Batchelder's opinion contests this link by bifurcating the Board's decision into two steps, one eliminating the alternative school and another granting Kingswood the contract. However, the vote about how to replace the alternative school never would have occurred but for the school's dissolution, and the vote about how to replace the alternative school was statutorily *required* after the school's dissolution. The fact that the Board could have picked a secular replacement is beside the point. What matters is that the Board chose Kingswood. The requirement of a replacement school inextricably ties the plaintiffs' lost jobs to the Kingswood contract.

compensate the teachers for lost salary and benefits,[4] a resolution well within the remedial power of the courts. *See Singleton v. Wulff*, 428 U.S. 106, 112–13 (1976) (holding that "there is no doubt" that a Missouri statute prohibiting the use of Medicaid benefits for abortions caused plaintiff physicians concrete injury and that their injury was redressable).

Under the prudential limitations on standing, however, even when litigants have established a substantial injury from a government action, they "cannot challenge its constitutionality unless [they] can show that [they are] within the class whose constitutional rights are allegedly infringed." *Barrows v. Jackson*, 346 U.S. 249, 256 (1953). The teachers' injury lies in the termination of their employment. Although they emphasize that their jobs "were expropriated for the benefit of a sectarian institution," Appellant Supp. Br. at 11, they do not claim specific losses resulting from their replacement by religious employees rather than nonreligious ones, and any psychological injury arising from the fact that public-school instruction is now taking place in a private religious institution would be a generalized grievance unless they can establish taxpayer standing (addressed below). *See Valley Forge*, 454 U.S. at 483, 485–86 ("Although respondents claim that the Constitution has been violated, they claim nothing else. They fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms."). When plaintiffs challenging government action under the Establishment Clause "allege only economic injury to themselves" and "do not allege any infringement of their own religious freedoms," they

---

[4] Judge Batchelder calls it "a matter of common sense" that the proper remedy for Establishment Clause violations is "an injunction or a declaratory judgment." Slip Op. at 39. Certainly, those forms of relief sometimes are the appropriate response to an Establishment Clause violation. There is no reason, however, to think that each right has exactly one appropriate remedy for all circumstances. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 410 (1971) (Harlan, J., concurring) (arguing that, while suppression sometimes is the appropriate remedy for Fourth Amendment violations, "[f]or people in Bivens' shoes, it is damages or nothing"). Judge Batchelder admits that the plaintiffs' injury in this case "hits in the pocketbook." Slip Op. at 37. Money damages clearly do redress a pocketbook loss.

will have standing only if they may raise the constitutional claims of third parties. *McGowan v. Maryland*, 366 U.S. 420, 429 (1961). In this case, the most obvious third parties whose rights are implicated are the students who may be exposed to religion at Kingswood and their parents.

"Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party." *Barrows*, 346 U.S. at 255. The Supreme Court has observed, however, that its salutary rule against third-party standing is not absolute. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). The rule "should not be applied where its underlying justifications are absent." *Singleton*, 428 U.S. at 114. In deciding when not to apply the rule, the Court has considered "two factual elements":

> The first is the relationship of the litigant to the person whose right he seeks to assert. If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit. Furthermore, the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter.

*Id.* at 114–15. Elsewhere, the Court has described this test as requiring that "the party asserting the right has a 'close' relationship with the person who possesses the right," and that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski*, 543 U.S. at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)); *see also Singleton*, 428 U.S. at 115–16.

The teachers may have a sufficiently close relationship to their students to satisfy the first prong of the test for third-party standing. The Supreme Court "has found an adequate 'relation' . . . when nothing more than a buyer-seller connection was at stake." *Kowalski*, 543 U.S. at 139 (Ginsburg, J., dissenting) (citing cases). In *Craig v. Boren*, 429 U.S. 190 (1976), the Court allowed a licensed beer vendor to assert the equal-protection rights of young men in challenging a law that allowed women aged eighteen to twenty-one years old, but not men of the same ages, to purchase low-alcohol beer. *Id.*

at 195. In *Carey v. Population Services International*, 431 U.S. 678 (1977), the Court found that a retail seller of contraceptive devices had standing to raise the due-process rights of its potential customers to challenge a statute variously limiting and prohibiting the distribution of contraceptives and barring their advertisement. *Id.* at 683–84. The teachers have a closer relationship to their students than was involved in either *Craig* or *Carey* because the teachers were responsible for the students' daily education; in the instant case, their rights and injuries are inextricably linked, and the teachers likely would be forceful advocates for the students' rights. *See Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–36 (1925) (allowing private schools to represent the due-process rights of parents whose children were required by law to attend public school); *see also Barrows*, 346 U.S. at 257 (citing *Pierce* as an example in which third-party standing was granted).

Although the teachers may be able to meet the first prong of the test for third-party standing, they cannot meet the second. Unlike in the key cases in which the Supreme Court has permitted third-party claims, we discern no indication here that the students or their parents face any obstacle in litigating their rights themselves. There is no evidence that the students or their parents might be deterred from suing. *See, e.g.*, *Singleton*, 428 U.S. at 117 (allowing physicians to challenge exclusion of abortions from Medicaid coverage when women would be chilled by desire to protect privacy); *Eisenstadt v. Baird*, 405 U.S. 438, 445–46 (1972) (allowing seller of contraceptives to assert equal-protection rights of potential purchasers for the same reason); *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (allowing physicians to challenge a law criminalizing use of contraceptives on behalf of married couples for the same reason); *NAACP v. Alabama*, 357 U.S. 449, 459 (1958) (allowing organization to asserts its members' rights to nondisclosure of membership lists to prevent "nullification of the right at the very moment of its assertion"). Nor is there evidence here that the claims of the students would be imminently moot, *see, e.g.*, *Singleton*, 428 U.S. at 117 (pregnant women); *Craig*, 429 U.S. at 192 (men aged eighteen to twenty), or that the students face systemic practical challenges to filing suit, *see, e.g.*, *Powers*, 499 U.S. at 414 (allowing

criminal defendants to raise potential jurors' equal-protection rights against race-based peremptory strikes because jurors' small financial stake, the expense of litigation, and the limited availability of equitable relief made juror suits rare in practice).  For this reason, the teachers' claims run afoul of the prudential limit on third-party standing. Therefore, the teachers do not have individual standing to sue for damages.

### 2.  Standing as Municipal Taxpayers

The teachers next argue that because they are municipal taxpayers, they have standing to challenge the Kingswood outsourcing as an expenditure of municipal funds alleged to be in violation of the Establishment Clause.  As a threshold matter, we note that Jefferson County is considered a municipality under Tennessee law.  *Weakley County Mun. Elec. Sys. v. Vick*, 309 S.W.2d 792, 804 (Tenn. Ct. App. 1957) ("Counties in this State have always been held to be public municipal corporations with limited powers, and liable as such." (internal quotation marks omitted)); *Jackson v. City of Paris*, 228 S.W.2d 1015, 1016 (Tenn. Ct. App. 1949).  In addition, the Board did not dispute on appeal that Forgety and Kucera were taxpayers of the municipality at the time they brought suit.  Finally, we note that Smith was not a taxpayer in Jefferson County at the time the complaint was filed, as he had moved to Georgia to pursue another teaching opportunity there.  There is no danger of Smith's tax dollars being spent in violation of the Constitution.  Thus, the doctrine of municipal-taxpayer standing may apply only to Forgety and Kucera.

The Supreme Court recognizes three types of taxpayer standing:  federal, state, and municipal.  All three categories of taxpayers must demonstrate that they were injured, that the challenged action caused their injury, and that the court could provide relief to redress that injury.  *D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 5 (D.C. Cir. 1988) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  In *Frothingham v. Mellon*, 262 U.S. 447, 487 (1923), the Supreme Court held that federal taxpayers have no standing to challenge the unconstitutional use of their tax dollars.  The Court reasoned that "[t]he administration of any statute, likely to produce additional taxation

to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern." *Id.*[5] The Court has likewise refused to confer standing on state taxpayers who show "merely that [they] suffer[] in some indefinite way in common with people generally," requiring them to raise a "good-faith pocketbook action" that involves "a direct dollars-and-cents injury." *Doremus v. Bd. of Educ. of Borough of Hawthorne*, 342 U.S. 429, 434 (1952).

Plaintiffs seeking to establish municipal-taxpayer standing are required to meet a less rigorous injury standard than those seeking standing as federal or state taxpayers. Unlike federal or state taxpayers, municipal taxpayers may fulfill the injury requirement by pleading an alleged misuse of municipal funds. *Frothingham*, 262 U.S. at 486. The Supreme Court has explained the rationale for its interpretation of the injury necessary to establish municipal-taxpayer standing:

> The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate. It is upheld by a large number of state cases and is the rule of this court. . . . The reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation.

*Id.* at 486–87 (citations omitted). As we have noted, this reasoning "appears to rest on the assumption that the relatively small number of taxpayers involved and the close relationship between residents of a municipality and their local government results in a direct and palpable injury whenever tax revenues are misused." *Taub v. Kentucky*, 842 F.2d 912, 918 (6th Cir. 1988). Although this assumption could be questioned in an age

---

[5]The Supreme Court carved out an exception to its rule against federal taxpayer standing in *Flast v. Cohen*, 392 U.S. 83 (1968), which allowed such suits to challenge congressional expenditures alleged to violate the Establishment Clause. *Id.* at 103–05. In *Valley Forge*, the Court clarified that this exception did not apply to Congress's transfer of property to religious institutions under the Property Clause. *Valley Forge*, 454 U.S. at 479–80. In *Hein v. Freedom from Religion Foundation, Inc.*, 551 U.S. 587 (2007), the Court further clarified that the *Flast* exception would not extend to expenditures made by the Executive, even when the funds were initially appropriated to the Executive's discretionary budget by Congress. *Id.* at 605–09. But none of these cases bear on municipal-taxpayer standing.

in which some cities boast populations in the millions, the rule "is one that the Supreme Court has maintained for 86 years and one we have no authority to second guess." *Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 287 (6th Cir. 2009); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 349 (2006) (noting that the issue of municipal taxpayers' standing to challenge a municipal tax exemption had not been raised and that the plaintiffs could not "leverage the notion of municipal taxpayer standing" to challenge a state franchise tax credit).

The defendants, however, argue that municipal taxpayers must show *more* than an alleged misuse of municipal funds. They contend that a potential plaintiff must show that the challenged government action resulted in a depletion of the municipal fisc. Appellees Supp. Br. at 13–14. The theory is that only an action that reduces the municipality's total funds, and thereby increases the risk that taxes will be raised, constitutes the dollars-and-cents pocketbook injury required by *Doremus*. Because the school board actually saved money by outsourcing its alternative-education needs to Kingswood, the defendants reason, the allegedly unconstitutional action could not possibly result in higher municipal taxation, and the teachers thus have no cognizable injury as taxpayers.

We reject the exhortation to apply this novel rule. There is no precedent for a requirement that municipal taxpayers show that an unconstitutional act shrinks the public treasury in order to establish standing. Indeed, any such rule would run directly counter to case law from the Supreme Court, from this court, and from our sister circuits.

As noted above, the Supreme Court has clearly stated that "resident taxpayers may sue to enjoin *an illegal use* of the moneys of a municipal corporation" and that "the remedy by injunction to prevent their *misuse* is not inappropriate." *Frothingham*, 262 U.S. at 486 (emphasis added); *see also Doremus*, 342 U.S. at 433–34 (quoting *Frothingham*'s statement that a municipality's taxpayers have a "direct and immediate" interest "in the application of its moneys" and can sue based on "misuse" (internal quotation marks omitted)); *Taub*, 842 F.2d at 918 (explaining municipal-taxpayer

standing as based on the theory that such taxpayers suffer "a direct and palpable injury whenever tax revenues are *misused*" (emphasis added)).  On that basis, a municipal taxpayer has standing to challenge any unconstitutional appropriation or expenditure, regardless of whether more money would have been spent had the government remained within constitutional bounds.  Taxpayer standing in this context will not turn on whether it was a bargain to violate the Constitution.

The idea that the unconstitutional spending of taxpayer money is itself an injury, actionable at the municipal level even if not at the federal level, is rooted in the stockholder analogy drawn by the Supreme Court in *Frothingham*.  A person who owns stock in a corporation values profitability, but she also has an interest in seeing her money well spent by the corporate officers.  "Like a shareholder of a private corporation, a municipal taxpayer has an immediate interest in how the municipality spends resources that reflect his contributions."  *Am. Atheists*, 567 F.3d at 285.[6]

The defendants' argument under *Doremus* to suggest otherwise is misplaced because that case concerned *state*-taxpayer standing and does not govern the case at bar.  In *Doremus*, state taxpayers challenged a New Jersey statute that provided for the reading, without comment, of the Old Testament in public schools at the beginning of each school day.  Requiring the plaintiffs to establish that their suit was a "good-faith pocketbook action," the Court denied standing because "the grievance which it is sought to litigate here is not a direct dollars-and-cents injury but is a religious difference."  *Doremus*, 342 U.S. at 434.  The Court, however, did not lay down any rules about *municipal*-taxpayer suits, and has repeatedly construed *Doremus* as a state-taxpayer case.  *See Hein v. Freedom from Religion Foundation, Inc.*, 551 U.S. 587, 600 (2007) (describing *Doremus* as a case involving "a state taxpayer's claim"); *DaimlerChrysler*

---

[6]The dissent mischaracterizes our opinion as an expansion of municipal-taxpayer standing such that "any county taxpayer [can] challenge any county action no matter whose interests are involved."  Slip Op. at 42.  But as *American Atheists* makes clear, municipal-taxpayer standing itself is a recognition that constitutionally dubious municipal spending implicates the interests of each municipal taxpayer.

*Corp. v. Cuno*, 547 U.S. 332, 345 (2006) (same);[7] *id.* at 354 (Ginsburg, J., concurring) (same); *ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989) (same); *United States v. City of New York*, 972 F.2d 464, 471 (2d Cir. 1992) (noting that *Doremus* involved state taxpayers and finding nothing in the case "to convince us that *Frothingham*'s view of municipal taxpayer standing is not still good law").[8] We implicitly recognized the limits of *Doremus*'s reach in *Taub*, acknowledging the Supreme Court's theory that municipal taxpayers necessarily suffer when government money is misspent but denying state taxpayers standing to challenge the spending of tax revenues to facilitate the construction of an automotive assembly plant. *Taub*, 842 F.2d at 918–19.

We recognize that some circuits have invoked *Doremus*'s "good-faith pocketbook action" language in cases involving municipal taxpayers, although never to hold that standing depends on a net loss to the municipal fisc. *See ACLU-NJ v. Twp. of Wall*, 246 F.3d 258, 262 (3d Cir. 2001); *Koenick v. Felton*, 190 F.3d 259, 263 (4th Cir. 1999); *Clay v. Fort Wayne Cmty. Sch.*, 76 F.3d 873, 879 (7th Cir. 1996); *Cammack v. Waihee*, 932 F.2d 765, 770 (9th Cir. 1991); *D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 4 (D.C. Cir. 1998). Their reasons for using *Doremus*'s language have not been particularly convincing. The Third and Seventh Circuits appeared to overlook the state/municipal distinction and to believe that *Doremus* itself applied its new rule to municipal taxpayers. *See ACLU-NJ*, 246 F.3d at 262; *Clay*, 76 F.3d at 879. The Fourth Circuit simply deferred to the Ninth Circuit. *See Koenick*, 190 F.3d at 263 (citing *Cammack*). The Ninth and D.C. Circuits relied on the *Doremus* Court's citation of *Frothingham* as evidence that the Court meant the pocketbook-injury requirement to extend to municipal-taxpayer cases, *Cammack*, 932 F.2d at 770; *D.C. Common Cause*,

---

[7]Contrary to the dissent's assertion, we do not read *DaimlerChrysler* as "implicitly undo[ing] previously applicable limits on municipal taxpayer standing." Slip Op. at 44 n.1. Rather than altering *Doremus*'s reach, *DaimlerChrysler* conformed to the Court's longstanding interpretation of *Doremus*.

[8]We note that two years later, in *Thompson v. County of Franklin*, 15 F.3d 245, 253 (2d Cir. 1994), the Second Circuit misread *City of New York* as "announc[ing] that an individual, municipal taxpayer has standing to challenge the imposition of an allegedly illegal expenditure when she brings a good-faith pocketbook action." *Thompson*, 15 F.3d at 253 (internal quotation marks omitted). The *Thompson* court appears to have focused on *City of New York*'s holding that an illegal expenditure sufficed for standing and overlooked that it declined to invoke *Doremus*'s "pocketbook action" language in the context of municipal taxpayers.

858 F.2d at 4, but nothing about *Doremus*'s citation of *Frothingham* suggests that inference. In *Doremus*, the Court cited *Frothingham*'s two rules—that federal-taxpayer standing generally is not permitted and that municipal-taxpayer standing to challenge misuse of funds generally is permitted—before proceeding to craft rules for state taxpayers. In doing so, the Court made no more mention of municipal taxpayers and instead noted the application to both federal and state taxpayers of the rule that common, indefinite suffering is insufficient for standing. *Doremus*, 342 U.S. at 434. Far from drawing together state- and municipal-taxpayer standing, the Court linked state- and federal-taxpayer standing. *See id.* ("[W]e reiterate what the Court said of a federal statute as equally true when a state Act is assailed . . . ."). Finally, the Ninth Circuit pointed to the fact that the *Doremus* Court, after declaring that state taxpayers must show a direct injury resulting from an allegedly invalid statute to establish standing, felt the need to "harmonize[] its announced rule with a school district taxpayer case," *Everson v. Board of Education of Ewing Township*, 330 U.S. 1 (1947). *Cammack*, 932 F.2d at 770. In *Everson*, the Court assumed that school-district taxpayers had standing to challenge a board of education's decision to reimburse the parents of parochial-school children for busing costs. The *Doremus* Court's citation of *Everson* is a precarious basis on which to extend the pocketbook-injury requirement, however. *Doremus* cited *Everson* just after it held that taxpayers had to establish a direct injury to challenge "a state Act." *Doremus*, 342 U.S. at 434. The *Doremus* Court likely cited *Everson* because the plaintiffs in *Everson* had also challenged the state statute authorizing the board to make rules for school transportation. Thus, the *Everson* case was relevant in *Doremus* because it involved a challenge to state law, not because it involved a municipal-taxpayer challenge to municipal action. Certainly, if the Court had intended the pocketbook-injury requirement to apply to municipal taxpayers, it could have said so much more directly.[9]

---

[9] A panel of this court cited *Doremus* in the context of a municipal-taxpayer case in *Hawley v. City of Cleveland*, 773 F.2d 736 (6th Cir. 1985), but only for the uncontroversial proposition that there exists "a distinction between the requirements of taxpayer standing in suits by federal taxpayers and suits by municipal taxpayers." *Id.* at 741. More recently, a panel of this court cited *Doremus*'s "dollars-and-cents injury" language in *American Atheists*. 567 F.3d at 285. But that case neither explicitly extended *Doremus* to municipal taxpayers nor depended for its result on the application of the good-faith

More importantly, while some of our sister circuits have cited *Doremus*'s pocketbook-injury language in municipal-taxpayer cases, they have not *applied* it in the way that the defendants urge. None has required municipal taxpayers to show a depletion of public funds to reach the courthouse door. To the contrary, all agree that the unconstitutional expenditure of government funds can itself be injury enough to confer municipal-taxpayer standing. *See Koenick*, 190 F.3d at 263 (applying the principle that "a municipal taxpayer has standing in cases where the litigant's only injury is the alleged improper expenditure of municipal funds"); *City of New York*, 972 F.2d at 466 (holding that "municipal taxpayers do have standing to challenge municipal expenditures even where there is no likelihood that resulting savings will inure to the benefit of the taxpayer"); *Cammack*, 932 F.2d at 770 ("[W]e conclude that municipal taxpayer standing simply requires the 'injury' of an allegedly improper expenditure of municipal funds . . . ."); *D.C. Common Cause*, 858 F.2d at 5 ("The Supreme Court has never required state or municipal taxpayers to demonstrate that their taxes will be reduced as a result of a favorable judgment."); *Donnelly v. Lynch*, 691 F.2d 1029, 1031 (1st Cir. 1982) (in suit involving Christian nativity scene in city-sponsored Christmas display on public property, finding standing based on the longstanding rule that municipal taxpayers can challenge "allegedly unconstitutional use of their tax dollars"), *rev'd on other grounds*, 465 U.S. 668 (1984); *cf. ACLU-NJ*, 246 F.3d at 263–64 (denying taxpayer standing because the plaintiffs failed to show that the maintenance of a religious holiday display near the entrance of a government building involved an expenditure); *Doe v. Duncanville Indep. Sch. Dist.*, 70 F.3d 402, 408 (5th Cir. 1995) (denying taxpayer standing where there was no evidence that the school district spent any funds on the distribution in school of Bibles, which were simply left on a table in the school by the Gideons); *Freedom from Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1470 (7th Cir. 1988) (denying taxpayer standing where there was no evidence that the city had used tax revenues to maintain a display of the Ten Commandments in a public park).

----

pocketbook-injury requirement, and any such extension would not be binding on the en banc court.

This approach is perfectly consistent with our own case law, which has conferred standing on municipal taxpayers who challenge government expenditures that allegedly violate the Constitution. In *American Atheists*, we explained that "[o]nly if the challenged local government action involves neither an appropriation nor expenditure of city funds will the municipal taxpayer lack standing, for in that case he will have suffered no 'direct dollars-and-cents injury.'" *Am. Atheists*, 567 F.3d at 285. We held that municipal taxpayers had standing to challenge grants given to three churches as part of a downtown revitalization project, reasoning that "[a]ll that matters is that American Atheists alleges that Detroit—a city—misspent taxes its members have paid." *Id.* at 286; *cf. Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 731 (6th Cir. 2009) (holding that state taxpayers had standing to challenge state funding of a home for at-risk children that allegedly used the funds for religious activities); *id.* at 733 (listing cases in which courts "have upheld taxpayer standing when grants, contracts, or other tax-funded aid are provided to private religious organizations pursuant to explicit legislative authorization").

Undeterred, the defendants cite our decision in *Hawley v. City of Cleveland*, 773 F.2d 736 (6th Cir. 1985), in support of their contention that an expenditure of municipal funds will not suffice for standing unless that expenditure entails the depletion of the public fisc. The citation is misleading. *Hawley* is part of a line of cases in which the alleged injury was not the spending of tax money, but the failure to collect it in the first place. In *Hawley*, Cleveland taxpayers sued to enjoin the local airport's lease of space to the Catholic Diocese for use as a chapel at an allegedly below-market rate. We concluded that standing existed on the theory that the lease to the diocese may have brought the city less money than it would have earned renting the space to another entity. *Hawley*, 773 F.2d at 741–42. Similarly, in *Steele v. Industrial Development Board*, No. 93-5350, 1994 WL 599458, at *1 (6th Cir. Nov. 1, 1994) (unpublished opinion), we granted municipal taxpayers standing to challenge the issuance of tax-exempt bonds to a church-run university, again on the basis of reduced revenues flowing into the city's coffers. And in *Johnson v. Economic Development Corp. of the County of Oakland*, 241

F.3d 501, 508–09 (6th Cir. 2001), we held that the loss of revenue potentially incurred by the issuance of tax-exempt bonds to finance construction at a Catholic school gave state taxpayers standing to sue. In each of these cases, standing necessarily was linked to the plaintiffs' tax burden: as they had no direct interest in the conferral of tax breaks on third parties—that is, in the treatment of other people's money—they could state an injury based only on the potential that their own taxes might rise as a consequence. The same cannot be said of expenditure cases, in which taxpayers can articulate the separate injury that the government is spending their tax money illegally. Such plaintiffs complain not that the government, having spent certain money, might demand more of them, but rather that it has misspent what it has already collected.

In sum, the rule that plaintiffs must show depletion of the public fisc in order to access the courts has no foundation, explicit or implied, in the binding decisions of the Supreme Court. And with good reason. Determining whether a municipality "lost" or "saved" money raises a host of implementation problems. Consider the Kingswood contract. One method to calculate depletion is to compare the average yearly cost of the Kingswood contract with the average yearly cost of the alternative public school during its final five years. But the results might differ if the court compares the last year of the alternative school with the first year of Kingswood. Moreover, because both methods rely on past costs, neither would prove reliable if the market for alternative schools changes. The Kingswood contract might "save" the municipality money in the short term, but five years from now, the (now-closed) alternative public school might be the more cost-effective option. There is no principled way to determine what costs or savings we should compare and over what time period we should compare them.

The Court has specifically carved out an expansive understanding of taxpayer standing at the municipal level, *Frothingham*, 262 U.S. at 486–87, and the imposition of the defendants' rule would have the peculiar contrary effect of rendering municipal-taxpayer standing narrower than federal-taxpayer standing in some cases. Had Congress taken the action at issue here, federal taxpayers surely would have standing under *Flast*, which did not require that unconstitutional spending result in a net loss to the federal

treasury. By the same token, a local government should not be able to evade suit simply because it was cheaper to violate the Constitution. Because Forgety and Kucera allege that the county spent their tax dollars in violation of the Constitution when it outsourced alternative education to Kingswood—and regardless of whether the county would have spent more to follow the law—they meet the injury element of standing as municipal taxpayers under *Frothingham*.

We turn, then, to the requirements of causation and redressability. When plaintiffs' sole request for relief is an order enjoining the conduct at issue, "causation and redressability are essentially identical requirements." *D.C. Common Cause*, 858 F.2d at 5 (citing *Allen*, 468 U.S. at 753 n.19). The D.C. Circuit has explained how to apply these elements to taxpayers who challenge an unconstitutional expenditure:

> The taxpayer's injury is not the *payment* of taxes, for which the only cure would be a rebate or reduction in taxes. Just as the shareholder need not prove that the funds he claims the Board of Directors has misapplied will be returned to him as a dividend, so the taxpayer need not show that the specific taxes he paid were used unlawfully, nor that his taxes will be reduced as a result of the judgment. By enjoining an illegal expenditure, the court can redress the taxpayer's injury caused by the misuse of public funds and ensure that the funds will be devoted to lawful purposes of possible benefit to the taxpayers.

*Id.* at 5. On this persuasive reasoning, we hold that Forgety and Kucera meet the causation and redressability requirements of Article III. Accordingly, they have established municipal-taxpayer standing. The district court erred in implicitly concluding otherwise.

With respect to the teachers' Establishment Clause claims under the U.S. Constitution, we **REMAND** the case to the district court for further proceedings consistent with this opinion. We also **REMAND** the teachers' Establishment Clause claims under the Tennessee Constitution for the district court to consider in the first instance.

## C. Procedural Due Process

In addition to their Establishment Clause claim, the teachers also raise a procedural-due-process claim. The district court did not analyze this claim; instead, it granted summary judgment to the Board based on its holding that the teachers failed to pursue their post-deprivation remedies. The teachers argue that their property rights include "the right not to be dismissed by abolition except in compliance with state law." Appellants Br. at 33–34. Also, the teachers contend that their positions were not abolished, but, rather, were improperly delegated. The Board asserts that even if the teachers could establish a property interest in their positions, nonetheless the teachers received all of the process that they were due because the Board was acting in a legislative capacity when it abolished the alternative school.

Analysis of the teachers' procedural-due-process claim involves two steps: establishing whether the teachers have a property interest in their positions, and determining what process (if any) is due them. *Leary v. Daeschner*, 228 F.3d 729, 741 (6th Cir. 2000). However, even if we assume that the teachers have property interests in their teaching positions, we cannot conclude that the Board violated the teachers' procedural-due-process rights because of the nature of the Board's activities. In order to determine whether the teachers received due process, the facts of the case require us to categorize the actions of the Board as it went through the budgetary process that led to the abolishment of the alternative school.

When examining the activities of an entity such as the Board, "'[w]e find little guidance in formalistic distinctions between "legislative" and "adjudicatory" or "administrative" government actions.'" *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 896 (6th Cir. 1991) (quoting *Harris v. County of Riverside*, 904 F.2d 497, 501–02 (9th Cir. 1990)). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998); *see also Nasierowski*, 949 F.2d at 896. Legislative functions involve "integral steps in the legislative process." *Bogan*, 523 U.S. at 55. In

*Bogan*, the "hallmarks of traditional legislation" were described as "a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents," and actions that terminate a position "may have prospective implications that reach well beyond the particular occupant of the office." *Id*. at 55–56. No notice or hearing is required before legislative action. *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614, 619 (6th Cir. 1997) (citing *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 244–45 (1973)). "[L]egislation normally is general in its scope rather than targeted on a specific individual, and its generality provides a safeguard that is a substitute for procedural protections." *Ind. Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004).

Because the Board engaged in legislative activity when it made the budgetary determinations that eliminated the alternative school, we hold that the Board did not violate the teachers' procedural-due-process rights. The Board's decision to abolish the alternative school and contract with Kingswood in order to save money was the result of weighing budgetary priorities, a legislative activity. *See Bogan*, 523 U.S. at 55–56. Thus, because the Board was engaged in a legislative activity, there was no requirement that the teachers be given notice or an opportunity to be heard prior to the Board's decision to abolish the alternative school. *See 37712, Inc.*, 113 F.3d at 619. In such circumstances, "the legislative process provides all the process that is constitutionally due" when a plaintiff's alleged injury results from a legislative act "of general applicability." *75 Acres, LLC v. Miami-Dade County*, 338 F.3d 1288, 1292 (11th Cir. 2003). Therefore, we hold that the Board's actions did not violate the teachers' procedural-due-process rights.

**D.  Substantive Due Process**

In addition to their procedural-due-process claim, the teachers raise a substantive-due-process claim. The district court concluded that "all substantive due process claims collapse into the decision on the plaintiffs' First Amendment . . . Establishment Clause claim[]." J.A. at 73 (Dist. Ct. Op. at 13). The teachers argue that

"[a]lthough substantive due process protections are limited, Plaintiffs may, in the context of a § 1983 action, establish a substantive due process claim when some state action has deprived them of a particular constitutional guarantee." Appellants Br. at 43. The teachers contend that the record demonstrates that their positions were not eliminated, but "merely delegated to a religious organization" in violation of the Establishment Clause. *Id.* at 33–34. The Board, however, argues that because the teachers alleged a violation of the Establishment Clause, they may not recover under the generalized concept of substantive due process.

Substantive-due-process challenges usually do not survive if a provision of the Constitution directly addresses the allegedly illegal conduct at issue. *Montgomery v. Carter County*, 226 F.3d 758, 769 (6th Cir. 2000). We have observed that

> the Supreme Court has repeatedly cautioned that the concept of substantive due process has no place when a provision of the Constitution directly addresses the type of illegal governmental conduct alleged by the plaintiff. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 394–95 (1989) (concluding that the reasonableness or unreasonableness of force used by police during an investigatory stop or arrest must be analyzed as a Fourth Amendment claim, rather than under "the more generalized notion of 'substantive due process'").

*Id*. Because the teachers' Establishment Clause claim directly addresses the conduct at issue, we affirm the district court's decision to dismiss the teachers' substantive-due-process claim.

**E. Legislative Immunity**

The Board members raise legislative and qualified immunity as defenses to the claims brought against them by the teachers. Having granted summary judgment to the Board on all of the teachers' claims, the district court held that the Board members' defenses of legislative and qualified immunity were moot. However, because we are remanding the Establishment Clause claim to the district court, we must consider the parties' arguments regarding immunity. Because we hold that the Board members are

entitled to legislative immunity, we do not need to address their claim that they are entitled to qualified immunity.

The teachers argue that the individual Board members are not legislators, and that their actions were void under Dillon's Rule.[10]   However, the Board members respond that they were performing a legislative function when they abolished the school, and, therefore, they should be granted legislative immunity.  The Board members did not address the teachers' Dillon's Rule argument.

We recognize that local legislators can be sued both in their individual and in their official capacities.  Although plaintiffs may sue a local legislator in his or her *official* capacity under § 1983, local legislators may invoke legislative immunity to insulate themselves as *individuals* from liability based on their legislative activities. *Bogan*, 523 U.S. at 49; *Canary v. Osborn*, 211 F.3d 324, 328 (6th Cir. 2000) (citing *Bogan*, 523 U.S. at 49); *Minton v. St. Bernard Parish Sch. Bd.*, 803 F.2d 129, 134–35 (5th Cir. 1986) (holding that absolute legislative immunity would shield officials from liability in their individual capacity).  In other words, local legislators will not face personal liability for their legislative activities.  "The immunity granted . . . applies whether the relief sought is money damages[,] or [declaratory or] injunctive relief." *Alia v. Mich. Supreme Court*, 906 F.2d 1100, 1102 (6th Cir. 1990); *see Supreme Court of Va. v. Consumers Union of U.S, Inc.*, 446 U.S. 719, 732–33 (1980). Officials who are not part of the legislature "are entitled to legislative immunity when they perform legislative functions." *Bogan*, 523 U.S. at 55.

---

[10]"'Dillon's Rule' originated with John F. Dillon, former Chief Justice of the Supreme Court of Iowa and former circuit judge for The United States Eighth Judicial Circuit." *Williams v. Town of Hilton Head Island*, 429 S.E.2d 802, 804 n.1 (S.C. 1993) (citing John F. Dillon, *Commentaries on the Law of Municipal Corporations* (5th ed.), § 237, p. 448 (1911)).  The state of Tennessee uses Dillon's Rule as a canon of statutory construction when determining the authority of a municipality. *Arnwine v. Union County Bd. of Educ.*, 120 S.W.3d 804, 807 (Tenn. 2003). Under Dillon's Rule, a municipal government has "authority to act only when:  (1) the power is granted in the express words of the statute, private act, or charter creating the municipal corporation; (2) the power is necessarily or fairly implied in, or incident to, the powers expressly granted; or (3) the power is one that is neither expressly granted nor fairly implied from the express grants of power, but is otherwise implied as essential to the declared objects and purposes of the corporation." *Id.* at 807–08 (internal quotation marks, emphasis, and brackets omitted).

Because we determined in our analysis of the teachers' procedural-due-process claim that the Board was performing a legislative function, we conclude that the members of the Board are entitled to legislative immunity in their *individual* capacities. *See id*. As noted above, the Board members did not need to be members of the legislature in order to enjoy legislative immunity. *Id*. The teachers, however, have argued that even if we find the actions of the Board to be legislative in nature, Dillon's Rule should prevent application of legislative immunity in this case. Even if the Board did not have the power to abolish the alternative school under Tennessee law, the Board members may still enjoy legislative immunity as individuals in federal court for their legislative actions, sound or unsound. *See R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 438 (6th Cir. 2005) (citing *Shoultes v. Laidlaw*, 886 F.2d 114, 117 (6th Cir. 1989) for the proposition that even if an ordinance is held to be invalid, officials acting in their legislative capacities are absolutely immune from suit). Legislative immunity exists so that individuals can feel more comfortable volunteering to perform public-service functions, such as serving on their local school board. Because "the threat of liability may significantly deter service in local government, where prestige and pecuniary rewards may pale in comparison to the threat of civil liability," *Bogan*, 523 U.S. at 52, legislative immunity continues to play an important role. Therefore, we hold that the Board members may be sued in their official capacities but may not be sued as individuals for money damages or declaratory or injunctive relief. Because the Board members are entitled to legislative immunity with respect to the claims made against them in their individual capacities, we need not address qualified immunity, which also is a doctrine applicable only in the context of individual-capacity suits.

### III. CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's conclusion that Smith did not have standing, but **REVERSE** its conclusion as to Forgety and Kucera, who have standing to bring suit as municipal taxpayers seeking to prevent misuse of their tax dollars. We **REMAND** the case to the district court for further proceedings consistent with this opinion.

Because we hold that the Board was performing a legislative function when it abolished the alternative school, we **AFFIRM** the district court's grant of summary judgment to the Board on the teachers' procedural-due-process claim. In addition, because we hold that the Establishment Clause claim adequately addresses the alleged substantive-due-process violation, we **AFFIRM** the district court's dismissal of this claim.

As to the Board members' legislative- and qualified-immunity defenses, we **REVERSE** the district court's determination that the issue whether the Board members qualify for these protections is moot. We hold that the Board members are entitled to legislative immunity on the individual-capacity claims because their decisions about the budget were legislative in nature. Because we conclude that legislative immunity applies to the individual-capacity claims against the named Board members, we need not analyze whether the Board members are entitled to qualified immunity.

─────────────────────────────────────────────

**CONCURRING IN FULL IN THE MAJORITY OPINION**
─────────────────────────────────────────────

BOYCE F. MARTIN, JR., Circuit Judge, joined by KAREN NELSON MOORE, Circuit Judge, concurring in full in the majority opinion. I join the majority opinion in full and write only to provide context to the factors identified in Judge Sutton's critique of the municipal-taxpayer standing doctrine. Judge Sutton's concurring opinion faults municipal-taxpayer standing because, today, the distinction between municipalities and states does not reflect a categorical difference in population size. The concurrence is correct with respect to these population differences. However, large cities and small states are not new to this country. In fact, the population differences between municipalities and states were *more* pronounced in the Roaring Twenties when the Supreme Court announced the doctrine of municipal-taxpayer standing in *Frothingham v. Massachusetts*, 262 U.S. 447 (1923), than they are today. The 1920 census reflected that eighty-nine cities were more populous than Nevada, the least populous state at the time. *See* U.S. Census Bureau, Demographic Trends in the 20th Century, at A-1 (2002), *available at* www.census.gov/prod/2002pubs/censr-4.pdf; Population Division, U.S. Census Bureau, *Population of the 100 Largest Cities and Other Urban Places in the United States: 1790 to 1990*, at Table 15 (Population Division, Working Paper No. 27, 1998), *available at* www.census.gov/population/www/documentation/twps0027/twps0027.html. However, as Judge Sutton notes in his concurring opinion, now only thirty-two cities are more populous than the least populous state. Concurring Op. at 32 (Sutton). Similarly, Judge Sutton notes that thirty-nine states presently have populations smaller than the population of New York City. *Id.* However, in 1920, the number was forty-four. U.S. Census Bureau, Demographic Trends in the 20th Century, at A-1; Population Division, U.S. Census Bureau, *Population of the 100 Largest Cities and Other Urban Places in the United States: 1790 to 1990*, at Table 15. Although Judge Sutton is correct that many cities are larger than states, because this is not a new phenomenon, I do not believe

this requires changes to our well-established doctrine of municipal-taxpayer standing. Moreover, to the extent this data is at all relevant to the issue of municipal-taxpayer standing, these changes suggest that the distinction between standing based on being a resident of a state and a municipality is more pronounced now than it was previously.

Similarly, developments in constitutional and prudential standing over the last century also do not warrant such a change. Judge Sutton's concurrence argues that plaintiffs who were not present in the religious school have not suffered the type of injury against which the Establishment Clause protects. That argument misapprehends the nature of the plaintiffs' injury. The injury to the plaintiffs was not witnessing the result of the expenditure, but the expenditure itself. Paying taxes that are used to support religion is precisely the type of injury that the Establishment Clause guards against. *See Flast v. Cohen*, 392 U.S. 83, 103 (1968) ("[T]he same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever." (quoting James Madison)). Although the plaintiffs endured their injury alongside all other taxpayers in their municipality, their personal tax payments were particularized losses. The undertone of the concurrence's argument is that the tax loss suffered by an individual plaintiff is too small to be cognizable. However, even nominal damages suffice for purposes of standing. *See Lynch v. Leis*, 382 F.3d 642, 646 n.2 (6th Cir. 2004) (applying 42 U.S.C. § 1988 and citing *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001), and *Carey v. Piphus*, 435 U.S. 247, 266 (1978)). Additionally, the majority opinion, which Judge Sutton concurs in, holds that whether the unconstitutional disbursement actually saved the taxpayers money is irrelevant in determining standing. Therefore, although the standing doctrine has unquestionably changed, I do not believe these changes have any impact on municipal-taxpayer standing.

Finally, the varied sources that combine to fund municipal treasuries discussed in Judge Sutton's concurrence also do not affect the viability of this doctrine. From the perspective of a municipal taxpayer, funding unconstitutional conduct may be cheap

because other sources subsidize the expenditures. But, municipal-taxpayer standing has never hinged on the amount by which an expenditure would affect the municipal treasury. So long as municipal funds are at stake, the amount of loss is irrelevant. An injury has occurred and standing exists whether a municipality unconstitutionally spends $1,000,000 with ten percent of the funding originating in municipal taxes, or $100,000 entirely from municipal taxes. Therefore, even in light of the circumstances Judge Sutton identifies, I do not find the propriety of our long-established doctrine of municipal standing difficult to grasp or its justification in need of reconsideration.

─────────────────────────────────────────────

## CONCURRING IN FULL IN THE MAJORITY OPINION

─────────────────────────────────────────────

SUTTON, Circuit Judge, concurring. I join the majority opinion in full and write separately (1) to identify a tension between the municipal-taxpayer-standing doctrine and modern standing principles and (2) to elaborate why the doctrine applies to a local expenditure that purports not to increase any burden on the local public fisc but to save money.

1. Whatever the virtue of a line between state- and municipal-taxpayer standing at its birth 88 years ago, *see Frothingham v. Mellon*, 262 U.S. 447 (1923), the point of the demarcation is difficult to grasp today. Start with the reality that it is hard to draw a meaningful distinction between the stakes of taxpayers in litigation based solely on geography, whether in 1923 or today. Thirty-two cities currently have populations larger than at least one State, and New York City, the largest municipality in the country, holds more people than 39 States. *See Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 286 (6th Cir. 2009). If the point of limiting taxpayer standing is to avoid the resolution of "generalized grievances" in federal court, *see Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 600 n.2 (2007), why does a New Yorker have standing based on an injury shared with 8,275,000 others while a resident of North Dakota lacks standing based on an injury shared with 647,000 others? *See* Population Division, U.S. Census Bureau, Annual Estimates of the Resident Population for the United States, Regions, States & Puerto Rico (2009), *available at* http://www.census.gov/popest/states/NST-ann-est.html; Population Division, U.S. Census Bureau, Annual Estimates of the Population for Incorporated Places over 100,000 (2007), *available at* http://www.census.gov/popest/cities/SUB-EST2007.html. If a state taxpayer has not "sustained" or is not "immediately in danger of sustaining some direct injury as a result" of enforcement of an allegedly unconstitutional law and "merely . . . suffers in some indefinite way in common with people generally," *Doremus v. Bd. of Educ.*, 342 U.S. 429, 434 (1952) (internal quotation omitted), why isn't the

same true for a meaningful number of city taxpayers?  The gross population of the largest 37 cities (41.7 million) after all is roughly the same as the gross population of the 23 smallest States.  *See* U.S. Census Resident Population, *supra*; U.S. Census Incorporated Places, *supra*.

While the municipal-taxpayer doctrine has stood still, moreover, standing principles have moved on.  In the last few decades, the Court has made it clear that "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Allen v. Wright*, 468 U.S. 737, 751 (1984).  Yet how has a municipal taxpayer, whether from a large city or a small one, suffered a "personal injury" traceable to the passage of a general law merely because the law requires an appropriation of some money, and usually an infinitesimal amount of money from the taxpayer?  Standing law safeguards the separation of powers through the injury-in-fact requirement, insisting that a claimant "raising only a generally available grievance about government . . . does not state an Article III case or controversy."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 574, 576–77 (1992).  Yet how has a municipal-taxpayer claimant not done just that:  raised nothing more than a claim that the municipality must follow the law?  "[C]onvert[ing] the undifferentiated public interest in [government's] compliance with the law into an 'individual right' vindicable in the courts . . . would enable the courts . . . to become virtually continuing monitors of the wisdom and soundness of [government] action."  *Id.* at 577.  Yet if that is so, shouldn't federal courts insist that claimants challenging the validity of federal, state *and* municipal laws do more to establish injury in fact, traceability and redressability than allege that they paid their taxes?

Just as the state/city taxpayer dichotomy has grown more curious since *Frothingham*, so too has the gap in reasoning between the municipal-taxpayer-standing doctrine and *prudential* limitations on standing, namely that a claimant must suffer the type of injury that the constitutional provision at issue protects.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982).  The municipal-taxpayer-standing doctrine pays heed only to the taxes paid, not

to the nature of the constitutional claim. Here, as a result, the doctrine has permitted teachers who never witnessed anything remotely creating an Establishment Clause violation (because they taught at the old non-religious school, not at the new religious one) to challenge the law, even though the claimants seemingly could not satisfy prudential standing limitations. *See* Maj. Op. at 10–12; *Barrows v. Jackson*, 346 U.S. 249, 256 (1953).

One other oddity surrounds the doctrine. Perhaps in 1923 it was easy to speak of city and state treasuries as distinct. Yet today, particularly in the context of a public school case, it is pure fiction to think of municipal (or county) treasuries as holding money raised only through local taxes. Most city budgets contain state and federal dollars, often substantial sums of them, and many school district budgets consist *primarily* of state and federal dollars. On average, the federal government supplies 8.5% of the public school system funds, the state governments 48.7% of the funds and local sources 42.8% of the funds. At one extreme, local funds in Hawaii make up just 1.7%, while state sources account for more than 90%. Nat'l Center for Education Statistics, Revenues & Expenditures for Public Elementary and Secondary Education: School Year from 2002–03, tbl.2 (2005). Because the Court has long shown a concern for developing a "principled way of distinguishing" claimants with standing from those without it, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 348 (2006), there is much to be said for reconsidering the municipal-taxpayer-standing doctrine or, if not that, at least for recalibrating it to account for the world the way it is.

Save for one thing: The Supreme Court created the distinction and has stood by it for some time, requiring lower courts like ours to apply it as is. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). The Court suggested the doctrine in *Crampton v. Zabriskie*, 101 U.S. 601 (1879), and formally adopted it in *Frothingham v. Mellon*, 262 U.S. 447 (1923), explaining that municipal taxpayers, like the shareholders of a private corporation, have an immediate interest in how the municipality spends the resources they contributed to the entity. *Id.* at 487. In *Doremus v. Board of Education*, 342 U.S. 429 (1952), the Court clarified the other side of the

coin—that state taxpayers (and federal ones as well) have no such standing based on taxpayer status alone. And in 2006, the Court left no doubt about the continuing relevance of the distinction, when all nine members of the Court applied it to a case on review from this court. *See Cuno*, 547 U.S. at 345, 349–50; *id.* at 354 (Ginsburg, J., concurring). If any modification to the doctrine is appropriate, it must come from the Court.

2. Under current law, the municipal-taxpayer-standing doctrine applies to all appropriations, even those that purport to be "cost-saving measures." Pet. Rehearing at 12; *see* Dissent at 5. A contrary approach would force litigants and courts to determine at a fixed point in time, presumably when the lawsuit is filed, whether a law designed to be implemented over a period of years will net out in the black or in the red. That asks a lot, and more perhaps than the federal courts can deliver. As the majority correctly points out, a net-loss requirement raises a host of insurmountable implementation problems.

The roots of the municipal-taxpayer-standing doctrine in corporate law pose a conceptual problem as well. Let us assume for the sake of argument that the Kingswood contract violates the Establishment Clause and that the unconstitutional expenditures may one day amount to local "savings." Would a fiduciary's illegal expenditures be beyond reproach if the same could be said about a company's spending decisions—that the illegal acts eventually would save the company money? I don't think so, and the same should be true here. If a corporate fiduciary misspends shareholder funds, his liability (as opposed to any damages) does not turn on whether he can show that the expenditures turned into a good investment or a bad one. Imagine a fiduciary defending a breach on the ground that, in the year before the illegal expenditure, the corporation foolishly, but legally, spent *more* money on a related program or on the ground that deflation insulated the breach from liability. That is not how it works. An appropriation is an appropriation, and if it violates fiduciary duties or the Establishment Clause, a shareholder or a city taxpayer, as the case may be, may challenge the expenditure under current law.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

ALICE M. BATCHELDER, Chief Judge, concurring in part and dissenting in part. While I join Part II.C (procedural due process) and Part II.D (substantive due process) of the majority opinion, I cannot agree with the majority's conclusion that Plaintiffs have municipal taxpayer standing. I therefore join Judge Rogers' dissent with respect to that issue. Because I do not believe that Plaintiffs have standing to bring their Establishment Clause claims, I would affirm the district court's judgment dismissing those claims, I would not reach the question of legislative immunity, and I therefore do not join Part II.E of the majority opinion. I write separately only to note my disagreement with the majority's analysis of individual Article III standing and with its conclusion that Plaintiffs may have a sufficiently close relationship with the students at the alternative school to satisfy the first prong of prudential standing.

As the majority correctly states, every plaintiff must satisfy both constitutional and prudential standing requirements in order to bring an individual, first-party claim in federal court. To meet the constitutional minimum a plaintiff must show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

Both Plaintiffs and Defendants agree that each of the teachers has suffered an injury; each lost his or her position at the alterative school and the attendant benefits. Supp. Br. for Pl. at 8; Supp. Br. for Appellants at 9. This injury hits in the pocketbook, it is classically "concrete," "particularized," and "actual," and therefore satisfies the 'injury in fact' requirement. *See Lujan*, 504 U.S. at 560.

These individual injuries, however, are not "fairly traceable to [Defendants'] challenged action." Plaintiffs claim that the Board violated the Establishment Clause when it outsourced the alternative school to Kingswood for 2003–2004. That decision is the "challenged action of the defendant[s]." That decision, however, did not cause the teachers to lose their jobs. Their jobs were terminated when the Board voted to abolish the Board-run alternative school, a decision separate and distinct from the Board's later decision to contract with Kingswood. Both the Board's legal authority and the undisputed record make clear that Plaintiffs would have lost their jobs regardless of where the Board decided to place the alternative school program.

As a matter of Tennessee law, nothing about the Board's decision to abolish its own school compelled it to then contract with Kingswood. The majority is correct that the Board was required by Tennessee law to maintain at least one alternative school, *see* Maj. Op. at 9 n.3, but ignores the fact that the Board had broad discretion as to how to fulfill that mandate. After abolishing its own school, the Board was free to contract with a school such as Kingswood, make an arrangement with another school board to provide a joint alternative school, or "send its suspended or expelled students to any alternative school already in operation." Tenn. Code Ann. §§ 49-2-203(b)(12), 49-6-3402(a), 49-6-3402(h)(1) (2009). The wide range of options available to the Board is consistent with Tennessee's legislative choice to "grant[] broad discretionary powers to the county Board of Education to . . . govern[] the public schools as the Board deems advisable." *Morrison v. Hamilton County Bd. of Educ.*, 494 S.W.2d 770, 772 (Tenn. 1973); *see State ex rel. Thompson v. Marion County Bd. of Educ.*, 302 S.W.2d 57, 59 (Tenn. 1957); *see also* Tenn. Code Ann. § 49-2-203(a)(2) (2009).

The record bears out the distinction between the two Board decisions. The Board's choice of Kingswood was clearly related in time to the decision to close the Board's own alternative school. The Board explored the pricing with Kingswood before the meeting, and made the decisions in sequence at the July board meeting. Circumstantially, these actions are tied together. But the same undisputed record shows that the decisions were nonetheless distinct. At the July meeting the Board addressed

agenda item six, the current alternative school program. After discussion, it voted to "delete the Alternative School program." J.A. Vol. I at 351. Then, the Board moved to agenda item seven, the alternative school proposal. It discussed the proposed Kingswood contract, heard from and questioned Kingswood representatives, and only then voted to contract with Kingswood for one year. *Id.* at 352. While the decisions were close in time and subject-matter, they were not coterminous. The Board was free, after the first vote, to make whatever choice it wanted in the second—it possessed unrestrained discretion to reject the Kingswood plan and seek out another solution. The Board continued to debate the Kingswood proposal after the first vote abolished the current school. The second vote came only after the conclusion of that debate. But by that point, the damage to Plaintiffs was already done. Nothing in their circumstances changed or could change as a result of the second vote—their previous positions had been "deleted" by the first.

Considering whether the teachers' injury is redressable further exacerbates the standing problem in this case. The majority claims that Plaintiffs' "injury can be redressed by an order that the Board compensate the teachers for lost salary and benefits," and that relief would, in the abstract, redress the injury of losing a job. Maj. Op. at 9–10. This case, however, is not abstract. Plaintiffs' claim for monetary damages rests on an alleged Establishment Clause violation. As a matter of common sense, when the claim is that the government is establishing religion, the remedy is an injunction or a declaratory judgment telling it to stop. *See*, *e.g.*, *Salazar v. Buono*, __ U.S. __, 130 S. Ct. 1803, 1812 (2010) (Kennedy, J., plurality opinion) (seeking an injunction); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 469 (1982) (seeking declaratory judgment). Plaintiffs have not cited, and I have not found, any precedential case where monetary damages were awarded for an Establishment Clause violation. While Plaintiffs have sought a declaratory judgment in this case, the majority does not rely on that request for the simple reason that such a judgment would not redress *Plaintiffs'* injuries. A declaratory judgment would stop any injury to students, but would not reinstate Plaintiffs' jobs. As previously explained, the

Board would still be free, after such a judgment, to outsource the program to another provider. Plaintiffs' claim is essentially a contractual one smuggled in under the guise of an Establishment Clause claim. The disconnect between the available remedies and Plaintiffs' injuries not only highlights the causation problem; it bolds, italicizes, and underlines it.

By articulating the "conduct of which the defendant complains" and comparing it to Plaintiffs' injuries, one can clearly see that there is no causal connection between Plaintiffs' injuries and the Board's conduct that allegedly violated the Establishment Clause. The Board's decision to abolish their alternative school was entirely within its authority, and it was that decision that terminated the teachers' jobs. No one has claimed that abolishing the alternative school violated the Establishment Clause, and the majority reaches its conclusion only by erroneously turning two separate actions into one. Accordingly, I would hold that Plaintiffs do not have individual Article III standing, and would therefore not reach the prudential standing question.

I also briefly note my disagreement with the majority's dicta that the teachers "may have a sufficiently close enough relationship to their students to satisfy the first prong of the test for third-party standing." Maj. Op. at 11. Because Plaintiffs cannot show a hindrance to the students' and parents' bringing their own suit, it is unnecessary for the majority to opine on whether a close relationship existed. Even if it were necessary, however, the majority's conclusion is dubious. Plaintiffs are not "forceful advocates" for their former students' First Amendment rights in the same way that parents are advocates for their children. This is all the more true considering the nature of Tennessee's alternative schools, which exist for students who have been temporarily removed from their primary school. *See* Tenn. Code Ann. § 49-6-3401 (2009). Such students may be in an alternative school for as little as a few days, hardly enough time to develop anything like a "close relationship." Prospective or hypothetical relationships cannot sustain third-party standing. *Kowlaski v. Tesmer*, 543 U.S. 125, 130–31 (2004) (holding that no close relationship existed between attorneys and prospective clients). Furthermore, as explained above, the teachers' rights and injuries are in no way

"inextricably linked" with the students' rights and alleged injuries. The teachers' interest is to be compensated for losing their jobs. That is hardly the same as the students' interest in not being compelled to worship. Deciding whether there is a "close relationship" requires a much more careful and fact-based analysis than that undertaken – unnecessarily – by the majority here. *See id.* at 130–31.

I would affirm the district court's opinion on these issues and would further join Judge Rogers in concluding that Plaintiffs lack municipal taxpayer standing. I therefore respectfully **dissent** from the corresponding portions of the majority opinion.

---

**DISSENT**

---

ROGERS, Circuit Judge, dissenting.  The plaintiffs in this case lack prudential standing in their capacity as teachers to make their Establishment Clause challenge in this case, as the majority properly determines.  The plaintiffs would be litigating the rights of third parties—e.g., children who would be subject to government imposition of religion—who have not sued.

The plaintiffs also lack Article III standing as taxpayers.  To hold that some of the teachers nonetheless have standing as county taxpayers because the county is misusing county funds, without more, permits the wholesale disregard of third-party standing limits in the context of this case.  The holding also opens up the prospect of permitting any county taxpayer to challenge any county action no matter whose interests are involved.  Because counties act through their paid officers and employees, any unconstitutional action could amount to misuse of county funds.  The armchair newspaper reader and county taxpayer who reads that a high school principal replaced a coach could sue because the replaced coach was of a different race or gender.  The same newspaper reader might be able to sue because an across-town local policeman used unreasonable force.

No Supreme Court or Sixth Circuit precedent requires us to set such a questionable precedent, even though standing requirements for municipal taxpayers are less demanding than those for state or federal taxpayers.  *See Taub v. Kentucky*, 842 F.2d 912, 918 (6th Cir. 1988).  Instead, municipal taxpayer standing law requires that the challenged county action involve an identifiable, negative effect on the county fisc.  This limit is fairly derived from the holdings of Supreme Court and Sixth Circuit cases, and no other limit has been proposed to avoid the above-suggested sweeping possibilities.

It is true that the Supreme Court stated in *Frothingham v. Mellon*, 262 U.S. 447, 486 (1923), that a "remedy by injunction to prevent the[] misuse [of municipal funds]

is not inappropriate." But subsequent decisions of the Supreme Court and this court—in Establishment Clause cases at that—make clear that the *Frothingham* language refers to misuse that results in a loss to the public fisc such that a taxpayer's identifiable interest in that fisc is injured. In a case involving Bible-reading in the public schools, the Supreme Court quoted the *Frothingham* language but still required at least a diminution of public funds:

> [*Frothingham*] recognized . . . that "[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." Indeed, a number of states provide for it by statute or decisional law and such causes have been entertained in federal courts. Without disparaging the availability of the remedy by taxpayer's action to restrain unconstitutional acts which result in direct pecuniary injury, we reiterate what the Court said of a federal statute as equally true when a state Act is assailed: "The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."

> It is true that this Court found a justiciable controversy in *Everson v. Board of Education*, 330 U.S. 1 [(1947), a suit by a district taxpayer against a township board of education]. But Everson showed a measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of. This complaint does not. . . .

> [B]ecause our own jurisdiction is cast in terms of "case or controversy," we cannot accept as the basis for review, nor as the basis for conclusive disposition of an issue of federal law without review, any procedure which does not constitute such.

> The taxpayer's action can meet this test, but only when it is a good-faith pocketbook action. It is apparent that the grievance which it is sought to litigate here is not a direct dollars-and-cents injury but is a religious difference. If appellants established the requisite special injury necessary to a taxpayer's case or controversy, it would not matter that their dominant inducement to action was more religious than mercenary. It is not a question of motivation but of possession of the requisite financial interest that is, or is threatened to be, injured by the unconstitutional conduct. We find no such direct and particular financial interest here. If the Act may give rise to a legal case or controversy on

some behalf, the appellants cannot obtain a decision from this Court by
a feigned issue of taxation.

*Doremus v. Bd. of Educ.*, 342 U.S. 429, 433-35 (1952) (citations omitted).

*Doremus* cannot simply be dismissed as a state-taxpayer case. To be sure, the
challenged statute in *Doremus* was a state statute, but that just states the nature of the
constitutional claim against the local school board: enforcement of an unconstitutional
state statute. The defendant was a New Jersey borough school board, and one of the two
plaintiffs discussed by the Supreme Court is only described as having alleged that he was
a taxpayer of the defendant borough. *Id.* at 433. The Court described the record in clear
terms:

> There is no allegation that this [Bible-reading] activity is supported by
> any separate tax or paid for from any particular appropriation or that it
> adds any sum whatever to the cost of conducting the school. No
> information is given as to what kind of taxes are paid by appellants and
> there is no averment that the Bible reading increases any tax they do pay
> or that as taxpayers they are, will, or possibly can be out of pocket
> because of it.

342 U.S. at 433. For standing purposes, the instant case is indistinguishable.[1]
Furthermore, the above-quoted language refers on its face to municipal taxpayers, and
distinguishes *Everson*, a case that explicitly involved "district taxpayers." 330 U.S. at 3.
Moreover, as the majority recognizes, as many as six of our sister circuits read the

---

[1] I recognize that the Supreme Court relied in part on *Doremus* in deciding that state taxpayer suits
are subject to the same standing requirements as federal taxpayer suits. *DaimlerChrysler v. Cuno*, 547
U.S. 332, 345 (2006). The Court's two brief references to *Doremus* accurately reflected (1) that the
*Doremus* Court stated the policy underpinnings for federal taxpayer standing limits, and (2) the fact that
the suit in *Doremus* challenged a state statute. Because *DaimlerChrysler* involved a challenge to a state
statute, it made sense for the Court to find *Doremus* to be parallel in that respect. But *DaimlerChrysler*
can hardly erase the fact that *Doremus* involved a borough taxpayer challenging actions of a borough
school board, and that the Supreme Court in *Doremus* explicitly referred to municipal taxpayer standing.

Moreover, it would make little sense to read *DaimlerChrysler*, a case that limited state taxpayer
standing, to have implicitly undone previously applicable limits on municipal taxpayer standing. Indeed,
the Court in *DaimlerChrysler* rejected an argument by the plaintiff in that case, who was making a
Commerce Clause challenge to a state tax credit for DaimlerChrysler, that "the award of a credit to
DaimlerChrysler reduced [state distributions to local governments] and thus depleted the funds of 'local
governments to which Respondents pay taxes.'" The Court rejected the argument by saying that such
depletion was conjectural, and made no suggestion that such depletion was not required.

*Doremus* holding as applicable to municipal taxpayer suits. *See ACLU-NJ v. Twp. of Wall*, 246 F.3d 258, 262 (3d Cir. 2001); *Koenick v. Felton*, 190 F.3d 259, 263 (4th Cir. 1999); *Clay v. Fort Wayne Cmty. Sch.*, 76 F.3d 873, 879 (7th Cir. 1996); *Thompson v. Cnty. of Franklin*, 15 F.3d 245, 253 (2d Cir. 1994); *Cammack v. Waihee*, 932 F.2d 765, 770 (9th Cir. 1991); *D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 4 (D.C. Cir. 1988).

This court ruled similarly in a case that also clearly applies to municipal taxpayer standing. *Hawley v. City of Cleveland*, 773 F.2d 736, 737-38 (6th Cir. 1985), was an action challenging a lease of airport space for use as a chapel. We held that users of the airport had standing because they would have to use different concourses or stairways to avoid "unwelcome religious exercises." *Id.* at 740 (citation omitted). But the standing of Cleveland taxpayers depended on "whether the rental of the space for the chapel to the diocese at the agreed-upon price could harm Cleveland's fisc," and we remanded for a determination of that issue. *Id.* at 742. In doing so, we cited the very language of *Frothingham* referred to above regarding "misuse," summarized more recent cases including *Doremus*, and concluded that "the Supreme Court continues to allow suits by nonfederal taxpayers to enjoin unconstitutional acts *affecting public finances*." *Id.* (emphasis added); *see also Steele v. Indus. Dev. Bd.*, No. 93-5350, 1994 WL 599458, at *1 (6th Cir. Nov. 1, 1994) (issuance of tax-exempt bonds to a sectarian university). Here, in contrast to the situation in *Hawley* where the facts were not clear, it is undisputed that the elimination of the alternative school and the delegation to Kingswood did not adversely affect the public fisc. *Hawley* cannot be distinguished as involving a failure to collect—rather than an expenditure of—tax revenue. Compare Maj. Op. at pp. 20-21. Such a distinction is facially inconsistent with the taxpayer-standing analysis in that case, which turned on whether there was a "loss of revenue" or "harm to the public purse," and not on some artificial distinction between spending and not collecting revenue. Because the Board in this case had an obligation under state law to provide an alternative program, the delegation was not an additional expenditure, but instead reduced the financial burden on Jefferson County and its taxpayers. There is no

need to defend the public treasury because Jefferson County, and thus its taxpayers, have saved money as a result of the delegation.

In such a situation, a taxpayer asserts nothing more than a claim that the municipality must follow the law. The Supreme Court, however, has repeatedly held that "Art. III requirements of standing are not satisfied by 'the abstract injury in nonobservance of the Constitution asserted by . . . citizens.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 482 (1982) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 223 n.13 (1974)).

Finally, requiring municipal taxpayers to establish at least some diminution of the public fisc is fully consistent with the distinction between municipal taxpayers and state and federal taxpayers. For federal and state taxpayers to have standing, they must show *more* than just government action that depletes the treasury and thus creates the possibility of future taxation. *See DaimlerChrysler*, 547 U.S. at 345-46. This is because the interests of federal and state taxpayers in their respective federal and state treasuries "[are] shared with millions of others; [are] comparatively minute and indeterminable; and the effect upon future taxation . . . so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventative powers of a court of equity." *Id.* at 333 (quoting *Frothingham*, 262 U.S. at 486-87); *see also id.* at 345. Municipal taxpayers, on the other hand, have been held to possess a much more direct interest in the municipal treasury. Because municipal taxpayers are theoretically fewer in number, they have a more direct relationship with their local government such that a direct injury is presumed *when the municipal fisc is depleted*. *Taub*, 842 F.2d at 918.

A number of the cases cited by the majority as rejecting the requirement that the municipal fisc be depleted instead merely hold that a plaintiff need not show that *the plaintiff's taxes* must be affected. *See Koenick*, 190 F.3d at 263; *United States v. City of New York*, 972 F.2d 464, 466 (2d Cir. 1992); *Cammack*, 932 F.2d at 770; *Common Cause*, 858 F.2d at 5; *Donnelly v. Lynch*, 691 F.2d 1029, 1031 (1st Cir. 1982). These

cases are nonetheless consistent with a lesser, constitutionally minimum requirement in taxpayer cases that the municipality's funds be reduced. Without such a requirement, it is "Katie bar the door"—a county taxpayer could challenge virtually any county action without demonstrating a personal stake in the outcome of the suit.

Indeed, the District of Columbia Circuit reasoned that even though municipal taxpayers need not "demonstrate that their taxes will be reduced as a result of a favorable judgment," they must still show that "the challenged program involves a measurable appropriation of public funds." *Common Cause*, 858 F.2d at 5. The D.C. Circuit cited our decision in *Hawley*, among other authorities. *Id.* In short, without at least a demonstration of a reduction of the public fisc from the challenged action, municipal taxpayers lack Article III standing.

The federal courts have jurisdiction only when plaintiffs will get something by winning beyond the satisfaction that the government is complying with the law, and (absent congressional grants of standing) only when the plaintiffs rely upon legal principles that protect their interests. These fundamental principles keep the courts from constituting themselves as supervising review boards to decide in the abstract the constitutionality of all government actions. Under these principles, plaintiffs lack standing either as employees or as municipal taxpayers. The district court therefore does not have jurisdiction to address the substantive Establishment Clause issues in this case.

I agree with the majority's conclusion that the plaintiffs lack individual standing as teachers.[2] I join Parts II.C (procedural due process), II.D (substantive due process), and II.E (legislative immunity) of the majority opinion. I disagree with the majority's determination that plaintiffs have standing as taxpayers, and therefore respectfully dissent.

---

[2]In stating three requirements for prudential standing, the majority appears to identify being within the "zone of interests" as an independent, generally applicable requirement for prudential standing. Maj. Op. 9. The majority's analysis does not reach the "zone of interests" test, however, and the brief discussion of the role of the "zone of interests" test is therefore not necessary to the court's holding. For a critique of such an expansive view of the role of the "zone of interests" test, see *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 549 F.3d 641, 663 (6th Cir. 2008) (Rogers, J., dissenting).